Good morning, my name is Bill Pearson and I am here on behalf of the plaintiff and appellant affiliated FM Insurance Company. I'd like to start by reserving three minutes if I might for rebuttal. Manage your own time, I'll try to help remind you. Thank you. Your Honor, this case is before the court based on the negligence action that was being pursued by Affiliated was barred by a three-year Washington statute of limitation. We believe there are two issues before the court. The first is did the court identify the proper law in the state of Washington to apply and then did it apply the right law correctly? The facts, the material facts, are not greatly in dispute. They weren't greatly in dispute before the trial court and I don't believe that there is a substantial dispute between the parties before this court. The fire was originated in an engine compartment of the Seattle monorail. The monorail system was put into service in 1961 for the 1962 World's Fair. It's the allegation, actually it was the proof we believe presented to the trial court, that the monorail was grounded originally using a particular design known as a floating system. May I interrupt you just for a second to kind of catch up the chase here because the time is limited. It appears to me that your theory is that the new board, the terminal board, was the proximate cause of the fire. Is that it? That's correct. And there were at least some incidents after the terminal board was installed, correct? The terminal board was installed in 2001. In June of 2001 there was an incident reported involving an electrical arc which burned a one inch by three inch hole in a side door to car C of the Seattle monorail. The given Washington's slight injury rule in terms of the notification, why wasn't that fire enough to trigger the statute? First of all, it wasn't a fire. It was a hole. Well, it was an arc. I mean, it was an electrical arc, I assume. Yes, but an electrical arc is the proximate cause. It's the instrumentality that leads to the harm. It's the harm that triggers a statute of limitation, not the proximate cause. And that is a common thread through the line of cases that was before the trial court. So your first contention is it's the fire itself that triggers it. That's right. But assuming that it falls within the line of cases about where there's a one cause and there are different injuries that should put you on notice, some of the medical malpractice cases, why isn't... I gather from your brief you didn't think that this arcing was significant enough to trigger that rule. Tell me why. Well, first of all, the trial court, there are two lines of cases. The trial court chose the second one, the medical malpractice cases. And at the end of its decision, it spent a great deal of time talking about the steel versus organic case. In that case, the court started out by saying that in order to trigger a statute of limitations, the damage needs to be actual and appreciable, not simply nominal. That was the rule that it was applying. Your position is that a hole, a three-by-one hole in the door of the car was sort of nominal? One inch by three inches. Yes, Your Honor, that's nominal. And if you look in the excerpt of record, you'll find that the dimensions of the Seattle monorail are 118 feet by 14 feet. Now that, if you do the math, that's... But the forces needed to create that hole are considerable, are they not? Yes, but it's the damage, Your Honor, not the force. It's the damage which triggers the statute of limitation, not the electricity and or its amount that triggers the statute of limitation. And that's the whole point we were trying to make to the trial court. Right, but I mean, in the real world, if you blow a one-by-three-inch hole through a monorail car, that's got to cause some concern. Absolutely, but does that amount to actual and appreciable damage to trigger a statute of limitation? And the answer, we believe, is A, no, but B, it at a minimum raises a question of fact as to whether or not that amounts to enough to trigger the jury to decide, not the trial judge, on a motion for summary judgment. Is there evidence in the record of the cost of repairing that hole? There is not. In fact, I believe the evidence indicated that it was not repaired, which would raise the inference that it was not appreciable enough to cause concern. I gather from your answer that you don't think the medical malpractice cases are an apt analogy for this kind of injury. We do not. We argue that there was the appropriate line of cases started with the Washington State Supreme Court's decision in 1949, Thurr v. Condon. Now, that wasn't even mentioned by the trial court in its decision. In that case, which was a fire case, the Washington Supreme Court specifically held that if you had a situation where a hazard was created that was continuing, the statute of limitation was told until such time as the hazard was abated or alleviated. In this instance, we presented undisputed electrical engineering evidence to the trial court to the effect that the problem with this design for the ground system was a continuing problem, was in essence a continuing electrical hazard. Our argument to the trial court started with the proposition that under Thurr v. Condon, that continuing hazard effectively told the statute of limitation up until the time of the fire. It was the fire that unfortunately proverbially abated the hazard. The trial court didn't even discuss that. So, let me play this out for just a second on both theories. Under your continuing hazard theory, your theory to the jury would include the original design, right? That's right. And if in fact it turns out that we agreed with the trial court that the medical malpractice theory was the appropriate one, then you would be limited to damage caused by the terminal board design at that point and not on the original decision to shift from a floating system to a bonded system. That's right. Okay. But there was in effect virtually nothing, no damage. Right. I just wanted to get, I wanted to analytically kind of see what paths led where. So, if you envision a trial on the matter, it's a battle of the experts as to what extent the use of the terminal board was the precipitating cause of the fire, as opposed to the grounding system. Well, yes, because the terminal board effectively, in installing the terminal board, you had to make a choice between two designs. And the terminal board that was installed chose the design that we believed was wrong and which our insured was advocating should employ a which we believe would have obviated the electrical hazard and there would not have been any fire two years later. But it wasn't really the terminal board itself that would drive the design, was it? I mean, I realize, I think I understand your theory, which is that was a decision point, whether to either go back to the original design or a new one. But the terminal board itself had nothing to do with that, did it? Oh, absolutely, Your Honor. There's a picture in the excerpt of record which shows a picture of the terminal board and actually there's a small little metal bar, looks like this. And the design decision was whether or not that bar was installed or removed. You're talking about the metal bar that kind of goes behind the... Exactly, Your Honor. You take that bar out, you return to the original floating design. I see, okay. I mean, in your view, simply removing that bar returns it to the original design? Yes, Your Honor, but that's our engineer's opinion, not mine. Yeah, no, I understand. Now, Counselor, after the terminal board was installed in 2001, was it? 2001, 2002? Yes. There were a couple of incidents, one of them involving smoke filling up the trains. Were those issues related to the grounding system? If I recall correctly, I think one of the problems, perhaps it was the smoke filling was actually due to a failed compressor rather than having anything to do with the grounding system. I'm trying to explore your continuing hazard theory a little bit further as it relates to the facts in the record. Your Honor, I think if you look at the record, the two incidents that there is evidence of, the first was at the end of June 2001. It was an incident where the monorail was pulling into a station and there was direct metal-to-metal contact to the outside of the monorail, and that burned a one-by-three hole. That was incident number one. The second incident was in March of 2002 when a maintenance worker was doing electrical work on the monorail and was shocked substantially, reported that, and that led to substantial discussions between Seattle Monorail Services and Glenn Barney, who was its operations manager, and the defendant Appel Lee, the engineering firm, about the need to go back to the original design, which would not have allowed for either an electrical arc or a shock. So in terms of an incident involving smoke filling up the monorail, I don't believe that there was any incident like that prior to the date of the fire when, in fact, what happened was you had a mechanical failure which led to an electrical connection, which caused some things in an engine compartment to ignite, and then the entire monorail was filled with smoke. I've got about four minutes left. Do you want to reserve? Yes, Your Honor. Good morning. May it please the Court. My name is Stephen Ray, and I'm here on behalf of Appel Lee, LTK Consulting Services, Inc. It seems to me the pivotal issue here is what Judge Robart decided below, and that is, were all the salient facts necessary for the appellant to know that it had a potential cause of action in place as of July 15, 2002? And as you'll recall, there are a lot of facts in the record about what was known to the Seattle monorail system. We have the incident report on June 19, 2001 that described a bang and the arcing condition that caused a one-inch by three-inch hole to burn into the side of the rail car, and that wasn't the first incident. The report makes reference to an earlier incident. It doesn't go into details as to precisely what happened, but this was not the first time this occurred. LTK was consulted and asked to solve this very problem. Mr. Barney from Seattle Monorail Systems made it absolutely clear that he wanted this problem solved. The decision to use a particular board or not to use a particular board, that's part of an overall design intent, and it's absolutely clear that LTK made the decision to not revert back to a floating grounding system, but to retain a bonded grounding system, and that Seattle Monorail Systems and Mr. Barney were absolutely adamant that that was the wrong way to go. So there was certainly no disagreement, at least in the record. It's absolutely clear there's a major disagreement about the whole design intent utilized. True. I mean, there's no question about that. There's a large dispute about the design itself, but if you credit the planar narrowing theory, which is the terminal board, at least they argue, was a proximate cause, why isn't there an issue of fact on whether or not the subsequent hole that was caused by the arcing was sufficient to trigger notice? It seems to me, Your Honor, that the decision to utilize a piece of equipment is not really what is being challenged here. Its concept is that there's negligent design being exercised for professional judgment. Do we have to credit your characterization of the planar theory? I mean, what they're saying is you're hijacking our theory and we'd like to pursue this broader theory, but if not, then we're going to rely on a narrower theory, which is it's the terminal board that caused it. And they've got an expert that says, yeah, the terminal board, the selection of the terminal board was a proximate cause. So why isn't that enough? Because they knew at the time, by July 15, 2002, they knew that the design that had been utilized selected this very piece of equipment and that was the whole dispute was, should we have a floating system, revert to the floating system, or use a grounded system, which happened to use this terminal board. But by July 15, 2002, when the cancellation notice goes out where Mr. Barney feels so strongly that everything that had been done, had been done so poorly that he wanted to terminate the agreement, refused to reimburse the city for the services rendered. He said that the services had been improperly rendered, had caused all these problems, that the existence of shocking was still happening, that we burned a hole in the side of the train, that this happened more than once. I believe that the court promptly found as a matter of law, that given all those facts and circumstances, the appellant was on notice that it had a potential claim. All the elements were there. There was a duty. Let's assume we agree with you, but your colleague here goes further. He says that, all right, there was perhaps a negligent situation that developed earlier when they changed the grounding system, but the installation of that terminal board, as he says in his brief, in an unqualified way, caused the fire. And he's got an expert, presumably he's going to testify to that. Why isn't that a matter for the jury? A properly instructed jury? Because the installation of the board is part of the overall services. LTK didn't actually install the board. It called for, and it's designed, the utilization of that board. I have no reason to doubt you, but you're making essentially a factual argument. I mean, I don't know what the expert's capable of saying. Presumably he's going to say what they said in their brief, which is the installation of that board caused the fire. In the original pleadings in the case, and that's what gave rise to the lawsuit, the allegation was that it was negligently designed and the decision was made improperly by LTK to not go back to the floating system. That's what formed the basis of the entire lawsuit. And now in a brief, supported by one statement of an engineer, the whole theory of the case has changed yet again. Well, that's the way litigation goes sometimes. But I'm looking at the expert report and he talks about the 1998 bonding wires replaced by bonding bar installed on a new terminal board in 2001. And goes on to say that the replacement was never approved outside the scope of work and substantially increased the risk of fire. So if you go to trial and they're limited to that theory, you can come in and say, well, no, no, no. They're relying on that. And really, you make the arguments that you're making today. But those very facts were known to them as of July 15, 2002. And the events which gave rise, the burning had already occurred. That's the exact same phenomena that ultimately caused the fire. That's why you'd be limited in the trial. The plaintiffs would be limited in the trial to the second theory. And the jury would have to be so instructed because the original negligence, if you will, would be time barred. But the installation of the board, that's actionable. What's wrong with that? I mean, I don't expect you to agree with it, but what's wrong with the theory? The theory, the board was installed prior to 2002. That was known by the appellant prior to 2002. And when they made the decision by July 15, 2002, they had already indicated to LTK and to the city that LTK's overall design, including the installation of that board, was improper. And that it was negligently done. And it was so bad that they wanted to terminate their obligation to pay for the work. They refused to actually pay for the work. And they suffered real and appreciable harm. If that's not enough, in this case, this is a case where- But that's not so different from our cases. You know, we've had, say, employment discrimination cases where lots of stuff has happened over 20 years. And the one instance within the statute of limitation periods we've held as actionable and the rest of it you can't talk about. I mean, that's, what's different? It seems to me that we're divorcing, segregating the fact that the instrumentality this particular board from the overall professional services rendered is inappropriate. LTK did a host of things. They had drawings that they created and designs, among which included the installation of this particular board. That doesn't mean that you can segregate the installation of the board from their overall services and say, well, based on that item alone, you can proceed on that item alone. And everything else you see- I'm assuming, Council, that when LTK did the modifications and installed this new terminal board that LTK believed that it had the problems fixed, right? It made a choice to stay with the grounded or bonded grounding system and then it made modifications to that system. And so from that point on, there were some minor problems. And now you're saying, even though there's an original dispute between whether it should be a floating bonded system and a floating grounding system versus a bonded grounding system, that during the course of discovery, the plaintiff isn't entitled to, based on discovery, slightly shift its theory as to what the cause of the 2004 fire might be? No, I'm not saying that they're not entitled to do discovery and put forth their theories of the case. What I'm saying is, in July 2002, at the point where the court determined as a matter of law all the elements and all the salient facts were known, they knew that this board was in place. They continued to say that the decision to maintain a grounded bonding system was causing harm and it caused the worker to be shocked in March of 2002. And they predicted it would continue to be a problem because the overall design that LTK utilized, in their view, was negligent and the appellant's view was negligent and was causing these difficulties. And that was all known to them since July 15, 2002, including the use of this particular board. That's the means by which the design was accomplished and that was the fundamental disagreement that started from the outset where Mr. Barney, from the very initiation of the work, said what they're doing is not acceptable. They're doing something wrong here. And he knew that they had suffered harm. He was so irate about it that he wanted to essentially terminate his agreements with the city and move on and he refused to pay for the services. But there are two... It's different to say that the board was included as part of the design is one thing. But post-fire, to say that the board was the cause of the fire is very different. And presumably, they have somebody who's prepared to testify to that. It seems to me whether the cause of the fire was the board or something else. And of course, we deny all the facts. Right, of course. True for purposes of this argument. Right. That irrespective of whether the board caused the fire or not, at the end of the day, as of July 15, 2002, they knew the board was there. That was part of the overall design that caused the system to be a grounded system. In the absence of the fire, we would have got a floating system. Presumably, if they're correct, and they're experts correct, we wouldn't be here. There never would have been any chance that the current would pass through into the bodies of the trains. I sense your frustration with us. But supposing, for example, that they created a hazardous condition by changing the grounding system. No question about it. And including the redesign that had this terminal board. But as it now, they took that hazardous condition, the fire happened, and now we have an expert saying it was the use of that terminal board that threw the kindling on the fire that was the last straw, use whatever characterization you want, that took a hazardous condition and started a serious fire. If that testimony is available to the plaintiff, I mean, how do we terminate the, on that theory, on that theory, how do we terminate the prosecution of the lawsuit? It seems to me, Your Honor, that if the terminal board was part of the design intent from the outset, and that's what was installed, and the burning occurs in June of 2001 to the rail cars, and everyone knows it's a problem, or the appellant takes a decision it's a problem, and it subsequently says that that's what caused the subsequent fire, they knew or should have known by July 15, 2002, that that terminal board was a potential problem because it was part of the grounded design system. In the absence of the terminal board, as I understand it, we would have had a floating design and we wouldn't have had a grounded system at all. I mean, that's what we presume, but that's, you know, we haven't heard the testimony yet. Do you agree with him on this picture that he showed that if you take out this bar, that that makes it a floating system? I'm not an engineer. I don't know. I'm not sure, but I believe that that is correct. But I'm not absolutely sure. One is inclined to wonder out loud, perhaps this is a question for your colleague here, after 27 years of successful service, why they changed the grounding system to begin with. I'm sure there were good engineers. I realize that puts a smile on your face to hear that suggestion, but we'll hear from your adversary. Any further questions? I think we have your argument. Anything? Thank you very much. Your Honor, I won't belabor the point. I think that the court has understood where plaintiff and appellant is coming from. The answer is to your question, there was no good reason in our opinion. Secondly, I think if you look at the excerpt of record, specifically to the expert report of Mr. Paul Way, you will see that, in fact, it was the opinion of our expert that it was that bus bar, as it's referred to, that was the proximate cause of the fire. Right, but in fairness, the bus bar, as I understand his report, was the key component that made it different from a floating and bonded system. Your theory is they should have returned to the original design, and that was the opportunity to do that. Exactly, and the opportunity to do so, Your Honor, would be have simply to go out to the maintenance bay and unscrew that bar, remove it, and in our expert opinion, the monorail is now, from a grounding standpoint, safe. So is the bus bar still there? No. Okay. Thank you. In case there will be some interesting decisions, thank you both. Mr. Way, we appreciate you coming out from Illinois and joining us on the 9th.
judges: Dearie, Thomas, Nguyen